THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MANUEL FEBRES RIVERA and FELIPE ROBLES PÉREZ, Defendants and Appellants.

No. 15993. Argued November 1, 1955.—Decided January 27, 1956.

---

*Manuel López Carrillo* and *Juan Nevares Santiago* for appellants. *Juan B. Fernández Badillo, Acting Attorney General,* and *Rafael L. Ydrach Yordán* and *Ramón Olivo Nieves, Fiscal* and *Special Fiscal of the Supreme Court,* respectively, for appellee.

MR. JUSTICE SIFRE delivered the opinion of the Court.

Appellants were prosecuted in the Humacao Part of the Superior Court for the crime of first-degree murder. The case was tried by a jury. The jury found them guilty of second-degree murder and both were sentenced to serve from ten to fifteen years' imprisonment in the penitentiary. In support of their appeal they assign four errors.

In the first assignment they contend that the trial court erred in "denying the petition . . . to reduce the classification of the crime . . ." The charge was that appellants " . . . on August 16, 1953 . . . illegally, with express malice, premeditation and deliberation, thereby evidencing the premeditated intent to illegally take the life of a fellow creature, assaulted and battered Juan Osorio Ramos, a human being, with a contusive instrument, causing injuries which resulted in his death on August 17, 1953."

The prosecuting attorney makes the following résumé, which is substantially correct, of the evidence presented by the People in support of the information:

"Dr. Eduardo Rodríguez Pérez was the first witness for the prosecution. He testified that about noontime on August 17, 1953, he treated Juan Osorio Ramos in the emergency room of the District Hospital of Fajardo, and that he was unconscious, talking incoherently, and moving his limbs; that he examined him and found a periorbital hematoma of both eyes, besides coagulated blood around the nose and mouth. There was a wound one inch long in the left temporo-occipital region, and his face was green, bloated, and cyanotic. X-rays of the multiple injuries received on the skull were taken and they revealed a big fracture with a depression in the left temporal region and a fracture of the left zygomatic arch extending to the left temporal fossa. The patient was taken to the hospital at 10:30 a.m. on August 17 and died at 7:30 p.m. on the same day. When the autopsy was performed, the cranial cavity was cut open at the level of the scalp, and it showed extensive hematoma which extended along the entire left epicranium and the epicranial calotte, that is, the scalp of the left side extending from the forehead to the occipital region. There was another extensive hematoma of the right occipital region, that is, a very large hematoma appeared on the back of the head extending all along the other side near the temporal muscle. The removal of the muscle revealed a fracture with depression of the left temporo-parietal region five centimeters long by two centimeters in diameter, or two inches by one inch, from whose anterior pole extended a lineal fracture about three centimeters long which disappeared into the left temporal fossa. Liquid blood, or subdural hematoma consisting of about 20 to 25 cubic centimeters of blood, was found in the cranial cavity. The cause of the death was undoubtedly due to shock following copious cerebral hemorrhage.

"On cross-examination he explains what is meant by recent hematoma as something where the extravasation of the skin is exposed for as long as 48 hours. It is likely that the hematoma presented by the victim was produced within the first 24 or 48 hours at the most. He states positively that the injury which produces a fracture by depression in the skull could have

never been produced by a blow with the fist. He contends, however, that it may be produced as a result of the blow or number of blows which he received. A physical examination of the patient revealed that his breath smelled of liquor.

"In the redirect examination he asserts that the injuries could have been produced by a fall on a rock, or by a club or pipe.

"Agapito Ortiz Rivera testified that he is the overseer of the Colonia Fortuna, a farm situated between Luquillo and Palmer and owned by the Land Authority, and that on August 17, 1953, he saw a man badly hurt at the entrance of the plantation.

"Camilo Robles Meléndez testified that he is 17 years of age, that he is a cousin of Felipe Robles Pérez, one of the codefendants, and that he also knows Manuel Febres; that on August 16, 1953, he was acting as salesclerk in a store located on the left side of Luquillo leading to Río Grande. This store is located near the Luquillo bathing resort. That day, between six and seven o'clock, he saw both defendants in the store. They were riding in a Packard automobile driven by Manuel Febres, and invited the witness to ride with them around the Parcelas Fortuna; that he and his brother Gabino Robles boarded the car. From there the four of them went to the Yukery Bar where they drank four beers, and from there to Pepin's Bar where Manuel Febres purchased a bottle of Cacique rum. From there they went to Luquillo and drove several times through the town. That was on a Sunday. They parked the car at the square in front of Tempo's Bar where Felipe Robles, the other codefendant, purchased a bottle of Superior rum. They then left for the Parcelas and stopped at Sira Guerra's Bar and returned to Luquillo where they stopped again at Tempo's Bar. It was here that Felipe Robles Pérez alighted from the automobile and went into the bar, and that Juan Osorio was there standing at the door. Felipe told him that he had played a dirty trick on him, to which Juan Osorio answered that he did not know what he was talking about. Juan Osorio then left and walked to the square and Felipe Robles followed him. Police officer Martínez, who was at the square, told them to keep going. That was what police officer Martínez said to Felipe and Juan Osorio. The other occupants of the vehicle made Felipe Robles get into the car. After riding around Luquillo several times they headed for Palmer.

Juan Osorio, who was standing near a small store, signalled the car to stop and asked to be taken to the Parcelas. Osorio could not see Manuel Febres because it was dark already and the car had no lights. Juan Osorio seated himself in the rear of the car between the witness and his brother. This took place about 9 p.m. and there was no light inside the car. When Juan Osorio got inside the car the defendants said nothing and kept going in the direction of the Parcelas. As they came to a small schoolhouse, Juan Osorio asked them to let him out, but the defendants kept going until they came to a dark alley in Colonia Fortuna, situated on the left side of the road leading from Luquillo towards Palmer, Río Grande and San Juan. When the car stopped Felipe Robles alighted, followed by Juan Osorio. The latter asked if they had brought him to beat him. Thereupon Felipe Robles struck him with the fist and knocked him down. In the meantime, Manuel Febres got out of the car with a pipe in his hand and started to strike Juan Osorio. Felipe Robles took the pipe away from Manuel Febres and also struck Juan Osorio. Both the witness and his brother attempted to interfere, but the defendants did not let them and Felipe Robles Pérez said 'I must kill this one'. Juan Osorio was lying on the ground while the defendants struck him with the pipe. The defendants and their two companions again boarded the car and instead of returning to Luquillo kept going toward San Juan and then stopped at the Cardona restaurant. Here they threatened the witness, who stayed in the restaurant.

"On cross-examination, Camilo Robles Meléndez testified that he is also a relative of the other defendant Manuel Febres Rivera. He reaffirmed the fact that after the defendants beat Juan Osorio, they stopped at Cardona's Bar. He insisted that he did not say a word to anyone about the occurrence because the defendants had threatened him. He recounted, step by step and without altering his statement, the movements of the defendants in and near Luquillo from 6 p.m. of August 16, 1953, when they invited him for a ride, to the time the victim was beaten by the defendants and abandoned." [1]

---

[1] To the summary of Camilo Robles' testimony we may add that he testified that he alighted from the car "in the midst of their quarrel," referring to a "quarrel" in which appellants and Juan Osorio Ramos intervened, and that in the course of the cross-examination he testified that the latter alighted from the car before Felipe Robles, one of the defendants.

■ After the People presented its evidence the defendants, who offered none, moved the trial court to reduce the charge from first-degree murder to voluntary manslaughter, on the ground that the only eyewitness, Camilo Robles Meléndez, made reference in his testimony to a "quarrel" between them and the deceased. They now complain that their motion was denied. It is evident that the court acted correctly in not granting defendants' request, since the jury was the one called upon to determine the degree of the crime perpetrated by the defendants, on concluding that they had incurred criminal liability for the death of Osorio Ramos. [2]

■ Appellants maintain, for the first time before this Court, that "in order to hold that the only crime committed . . . ," if any, "was voluntary manslaughter," the lower court should have taken into account the fact that they, Osorio Ramos and Robles Meléndez, had been drinking liquor, the former or appellants "heavily," and the latter "excessively," prior to the occurrences which resulted in their prosecution. Whether drunkenness—voluntary—of the defendant, not the drunkenness of the victim or of the witnesses, warrants consideration for the limited purpose indicated in the second sentence of § 41 of the Penal Code, is a matter to be determined by the trier of facts —the jury or the court sitting without a jury. *People* v. *Rivera,* 70 P.R.R. 541; *People* v. *Rosado, ante,* p. 416.[3] Appellants were tried, as already stated, by a jury. We need not decide whether the drunkenness—voluntary—of the defendant at the time of

---

[2] The lower court instructed the jury on the two degrees of murder and on the crime of voluntary manslaughter.

[3] Section 41 of the Penal Code provides that "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition. But, whenever the actual existence of any particular purpose, motive, or intent is a necessary element to constitute any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

perpetrating the crime, a circumstance which the trier may undoubtedly take into consideration in order to reduce the charge of first-degree murder to second-degree murder, may also be taken into consideration in order to discard the latter charge and return a verdict of voluntary manslaughter, a question on which the judicial precedents are not agreed. In the case at bar the only evidence presented, that of the prosecution, disclosed that appellants had been drinking before they assaulted Osorio Ramos, but it did not show that they were in a state of intoxication. The intoxication referred to in § 41 of the Penal Code must be of such degree as to render the defendant incapable to form or conceive the purpose, intent, or malice which under the law is a necessary element or ingredient of the crime. On this point, we stated as follows in *People* v. *Rivera, supra:* "The rule adopted in those jurisdictions where provisions of law identical or similar to that contained in § 41 of our Penal Code prevail, is that drunkenness—voluntary—must be of such degree or extent that it will deprive defendant of his mental capacity to form the specific intent required by the Code for the conviction of a crime—or degree thereof —requiring such specific intent . . ."

In the second assignment appellants complain that the verdict "is contrary to law and to the evidence . . ." This error is not discussed. From an examination of the record we are convinced that they are not correct.

In view of the evidence presented at the trial, the contention made in the third assignment that the verdict should have been set aside because no connection was shown between the defendants and the crime, cannot prosper.

It is contended in the fourth and last assignment that the lower court erred "in refusing to discharge the jury," because of certain comments made before them by the court and the prosecuting attorney. In his argument, the latter

stated that a verdict of voluntary manslaughter would be a victory for the defense, and that if such were the verdict he would consider he had lost the case. In answer to these statements, the presiding judge of the court of instance stated as follows: "The court believes that if a verdict is returned after the instructions are given, it will be a good verdict." Appellants maintain that the statements made by the prosecuting attorney influenced the jury against them, and that the statements made by the lower court deprived them of all possibility of being acquitted, since the jury was advised that a verdict of voluntary manslaughter would be a good verdict. The statements of the prosecuting attorney to which, incidentally, the defense did not object when they were made are without significance. Appellants have not shown that they were in any way prejudiced. We cannot agree that the trial court's statements led the jury to believe that it could not return a verdict of acquittal if it deemed it proper. Before giving the instructions, the court told the jury the following: ". . . As a result of this incident, the court made the assertion or statement that if you returned a verdict of voluntary manslaughter it was a good verdict. I do not want you to take these words as intended to influence your verdict at all. Those two individuals are not guilty until you try them and determine from the evidence whether they are guilty or not guilty." The jury was also charged that if they believed that "the crime is not proved, that the prosecuting attorney has not proved his case, or if you have well-founded and reasonable doubt as to the guilt of these defendants, then in any of these cases it is your duty to acquit them."

The judgments appealed from will be affirmed.